FILED
2025 Mar-21  PM 03:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

SAMUEL GRIFFIN,                     )
                                    )
          Plaintiff,                )
                                    )
vs.                                 )          Case No.  4:24-cv-00298-HNJ
                                    )
SOCIAL SECURITY                     )
ADMINISTRATION,                     )
COMMISSIONER,                       )
                                    )
          Defendant.                )

## MEMORANDUM OPINION

Plaintiff Samuel Griffin seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") regarding his claim for a period of disability and disability insurance benefits.  (Doc. 1).  The undersigned carefully considered the record, and for the reasons expressed herein, the court **REVERSES** and **REMANDS** the final decision of the Commissioner for further consideration.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate judge conduct any and all proceedings, including the entry of final judgment.  (Doc. 17).

"disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 1.00-114.02. *Id.* at § 404.1520(d). If a claimant's

impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience." (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 404.1520(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* § 404.1520(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education, and past work experience, that the claimant can perform other work. *Id.* § 404.1512(b)(3), 404.1520(g). If the claimant can perform other work, the evaluator

will not find the claimant disabled. *See id.* § 404.1520(a)(4)(v); *see also id.* § 404.1520(g). If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Indeed, "an ALJ's factual findings … 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g)). Although the court must "scrutinize the record as a whole … to determine if the decision reached is reasonable … and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence … is 'more than a mere scintilla,' … [and] means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (citations omitted). Therefore, substantial evidence exists even if the evidence

preponderates against the Commissioner's decision.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff Samuel Griffin, 66 years old at the time of the evidentiary hearing, filed an application for disability and disability insurance benefits on June 21, 2021, alleging disability as of December 20, 2020.  (Tr. 21, 148).  The Commissioner denied the application on May 25, 2022.  (Tr. 21).  Griffin requested reconsideration, which the Commissioner denied on November 10, 2022.  (Tr. 21).  Griffin timely filed a request for a hearing before an administrative law judge on December 1, 2022.  (Tr. 21, 90).  On June 22, 2023, the ALJ held a hearing.  (Tr. 37).

The ALJ issued an unfavorable decision denying Griffin's claim on October 25, 2023. (Tr. 21-31).  Applying the five-step sequential process, the ALJ found at step one that Griffin had not engaged in substantial gainful activity since the alleged disability onset date.  (Tr. 23).  At step two, the ALJ determined Griffin manifested the severe impairments of degenerative disk disease, degenerative joint disease in the right hip, and polyneuropathy.  (Tr. 25).

At step three, the ALJ concluded Griffin did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments—specifically, listings 1.15 (Disorders of the skeletal spine resulting in compromise of a nerve root(s)), 1.18 (Abnormality of a major joint(s) in any extremity),

and 11.14 (Peripheral neuropathy)—in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 25).

At step four, the ALJ found Griffin exhibited the residual functional capacity ("RFC") to "perform light work as defined in 20 C.F.R. 404.1567(c) except he can never climb ladders, ropes, or scaffolds"; "[h]e can occasionally stoop, kneel, crouch, or crawl"; "[h]e cannot be exposed to excessive vibration"; and "[h]e can never be exposed to workplace hazards such as moving mechanical parts and high, exposed places." (Tr. 26). In so finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (*Id.*). To this end, the ALJ found "[t]he claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (*Id.*). Given the afore-cited RFC, the ALJ deemed Griffin capable of performing his past relevant work as a Plumber Supervisor. (Tr. 30). Therefore, the ALJ concluded Griffin "was not under a disability … at any time from … the alleged onset date [to] … the date last insured." (Tr. 31).

Griffin filed a request for review of the ALJ's decision. (Tr. 1). On January 8, 2024, the Appeals Council denied Griffin's request for review, which deems the ALJ's decision the Commissioner's final decision. (Tr. 5). Griffin filed his Complaint in the present case on March 8, 2024. (Doc. 1).

## ANALYSIS

In this appeal, Griffin argues "the Commissioner erred as a matter of law in determining that he is not entitled to SSDI benefits and issued a decision that was not based on substantial evidence and is inconsistent with applicable law." (Doc. 15 at 1). Specifically, Griffin contends "[t]he ALJ failed to properly evaluate the credibility of [his] complaints of pain consistent with the Eleventh Circuit Pain Standard." (*Id.* at 5). As an initial matter, the undersigned finds the ALJ properly evaluated Griffin's subjective complaints of pain in rendering the RFC determination. However, the ALJ erred when it failed to resolve a conflict in the evidence regarding required narcotics testing for Griffin's past relevant work. *See Battle v. Astrue,* 243 Fed. App'x 514, 523 (11th Cir. 2007) ("When deciding the case, it is the ALJ's duty to weigh the evidence and testimony, *to resolve the conflicts in the evidence and testimony*, and determine whether [the claimant] with his RFC can return to his past relevant work, and we will not substitute our judgment for the ALJ's." (emphasis added)). The undersigned thus **REVERSES** the Commissioner's decision and **REMANDS** the case for further consideration.

## I.    THE ALJ PROPERLY ASSESSED GRIFFIN'S RESIDUAL FUNCTIONAL CAPACITY.

To determine whether a claimant can perform his past relevant work at step four or other work at step five, the ALJ must assess the claimant's RFC—the most a claimant can still do despite the physical and mental limitations resulting from his impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404. 1520(e); *Phillips v. Barnhart*, 357 F.3d 1232, 1238

(11th Cir. 2004) (superseded by statute as stated in *Portwood-Braun v. Commissioner of Social Security*, No. 22-11491, 2023 WL 2417856 (11th Cir. Mar. 9, 2023)). The ALJ must base its decision on all relevant evidence in the record, including medical history, medical signs and laboratory findings, the effect of treatment including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, and side effects of medication), daily activities, lay evidence, recorded observations, and medical source statements. *See* SSR 96-8p, 1996 WL 374184, at *5 (1996); 20 C.F.R. § 404.1545(a)(3).

When a claimant, as here, attempts to establish disability through his own testimony of pain or other subjective symptoms,

> [he] must satisfy two parts of a three-part test by showing: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain."

*Zuba-Ingram v. Comm'r of Soc. Sec.*, 600 F. App'x 650, 656 (11th Cir. 2015) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam)). A claimant's testimony coupled with evidence that meets the pain standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citations omitted).

Social Security Ruling ("SSR") 16-3p, effective March 28, 2016, and republished October 25, 2017, eliminates the use of the term "credibility" as it relates to assessing the claimant's complaints of pain and clarifies that the ALJ "will consider any personal

observations of the individual in terms of **how consistent** those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, 2017 WL 5180304, *7 (Oct. 25, 2017). An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location; duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* C.F.R. § 404.1529(c)(3), (4).

SSR 16-3p also clarifies the ALJ's burden when discrediting a claimant's subjective symptoms: "[I]t is not sufficient … to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough … simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." 2017 WL 5180304 at *10; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

9

At the evidentiary hearing on June 22, 2023, Griffin testified he experiences sharp pain in his lower right back and hip area akin to "an icepick sticking in [him]." (Tr. 47). In addition, he described numbness in his right big toe. (*Id.*).

Regarding his previous role as a Plumber Supervisor, Griffin confirmed he lifted a maximum of 15-20 pounds. (*Id.*). He described driving 73 miles one way to work, parking his car approximately three quarters of a mile away from the job site, and walking across a rough gravel parking lot. (Tr. 48). Griffin stated his job duties occasionally included climbing in ditches, handling tools, and "grab[bing] people up that are passed out" in emergency situations. (Tr. 56).

Griffin testified he could stand for 30 to 40 minutes at a time before requiring a period of rest. (Tr. 49). He stated he could sit upright without elevating his feet for approximately 30 to 45 minutes. (*Id.*). Griffin confirmed he could comfortably lift no more than 15 pounds without aggravating his pain. (Tr. 50). He recounted a recent episode in which he walked about 100 yards before requiring a period of rest. (*Id.*). He estimated spending half of a typical day lying down. (*Id.*). He stated climbing stairs aggravates his back and leg. (Tr. 51).

When asked about his treatment regimen, Griffin described taking 3 Percocet pills per day and an "arthritis-type" medication on occasion. (Tr. 50-51). In addition, he stated he regularly administers a heating pad. (Tr. 51). He rated his pain with medication as "a 5 or better." (*Id.*). Griffin noted his current medication regimen would disqualify him from holding many plumbing jobs. (Tr. 52-53 ("[T]he point I'm trying

10

to make is that I wasn't on that pain medication then that I'm on now, that shows up in your random drug tests, and then they kick you off the job…. And right now, I don't know what I would do without the chronic pain medications that I'm on…. [The medication] keeps you off a lot of these jobs.")).

On June 21, 2021, Griffin filled out a Disability Report. (Tr. 183). Griffin listed back problems, arthritis, type 2 diabetes, scoliosis, and high blood pressure as conditions causing him pain and limiting his ability to work. (Tr. 184). He explained he stopped working "because [he] was layed [sic] off due to no work and [his] medical conditions." (*Id.*). As a plumber, Griffin estimated spending one hour walking; two hours standing; one hour sitting; half an hour climbing; half an hour stooping; half an hour kneeling; half an hour crouching; half an hour crawling; half an hour handing large objects; half an hour writing, typing, or handling small objects; and half an hour reaching. (Tr. 186). He recounted carrying buckles of fittings weighing approximately 49 pounds over a 25-yard distance. (*Id.*). He confirmed frequently lifting 25 pounds and a maximum of 50 pounds. (*Id.*).

Griffin filled out an Adult Function Report on July 17, 2021. (Tr. 210). He explained his conditions limit his ability to work due to associated difficulties driving long distances, walking on uneven surfaces, and climbing stairs or ladders. (*Id.*). To this end, he noted he "could drive 75 miles one way with[out] stopping … and having to walk and stretch[ ]" before the onset of his conditions. (Tr. 211). In his description of a typical day, Griffin stated, "getting out of bed can be hard" and "[b]ending and

11

getting moving can be rough." (*Id.*). He described difficulty falling asleep but noted Tylenol 3 reduced these problems. (*Id.*).

Regarding household activities, Griffin reported mowing the grass on occasion, caring for his elderly mother and her dog, preparing meals, administering medication, and washing clothes. (Tr. 211-212). He denied ironing. (Tr. 212). He noted a housekeeper visits the home once a week to clean, assist his mother in the shower, climb ladders and stairs, carry heavy items, and otherwise "do all [of Griffin's] regular job tasks." (*Id.*). He confirmed going outside daily "[i]f only a walk in the yard with the dog," yet he admitted watching "a lot more tv" since the onset of his conditions. (Tr. 213-214). Griffin listed lifting, squatting, reaching, kneeling, and stair climbing as activities that aggravate his back pain. (Tr. 215). He indicated he must bend and stand slowly, and he noted walking "will help loosen up [his] back at times." (*Id.*). He reported he can walk a quarter of a mile before requiring a 4-5 minute rest. (*Id.*). He indicated Tylenol 3 produces drowsiness. (Tr. 217).

On October 18, 2022, Griffin filled out another Adult Function Report. (Tr. 232). Griffin stated he cannot sit, stand, or walk long distances, although walking short distances sometimes alleviates his pain. (*Id.*). He identified climbing stairs as "the most painful activity [he has] found yet." (*Id.*). Griffin denied climbing vertical ladders or pulling materials with a rope from one elevation to another since he filed for disability. (*Id.*). He stated his medications—particularly oxycodone-acetaminophen—"limit [him] from most jobs that [he has] worked in the past." (*Id.*). Griffin listed the following

activities performed in a typical day: cooking and eating, cleaning the kitchen and washing dishes, feeding the dog, taking a shower, brushing his teeth, watching TV, walking around his home, retrieving a newspaper, checking the mailbox, napping, conversing with neighbors, and taking medication. (Tr. 233). He explained his mother largely cares for herself, and he noted no problems with his own personal care. (*Id.*). Griffin claimed he could carry heavy loads, climb stairs, drive long distances, sit, stand, and walk without discomfort before the onset of his conditions. (*Id.*). He claimed sharp lower back pain occasionally wakes him up from sleep and noted "some mornings [it's] all I can do to get out of bed." (Tr. 233-34).

Regarding household chores, Griffin stated he could vacuum and do laundry. (Tr. 234). He denied ironing. (*Id.*). He confirmed mowing the yard as needed but admitted "taking a little longer" to do so. (*Id.*). He stated his nephew helps him complete household repairs, and his neighbor "[does] the weed eating and [trims] the bushes." (*Id.*). Griffin confirmed going outside every day; shopping for household necessities as needed; and reading, watching TV, and playing Internet games every day. (Tr. 235-36). He described attending American Legion meetings once a month and "going to the dances" twice a month, though he claimed he "can't do a lot of dancing." (Tr. 236). He denied driving long distances to Nashville for family activities. In addition, he denied attending church or sporting events because the "bathrooms [are] too far away." (*Id.*).

Griffin asserted his conditions affect his ability to lift, squat, bend, stand, reach,

walk, sit, kneel, and climb stairs. (Tr. 237). To this end, Griffin stated, "It takes longer to complete simple tasks. [I] find myself on the couch to find my comfort zone." (*Id.*). He reported he can walk 150 yards before requiring a 10-15 minute rest. (*Id.*). He indicated his medications produce abdominal cramps, fatigue, diarrhea, dehydration, low blood sugar, cough, and skin rash as side-effects. (Tr. 239).

In his opinion, the ALJ summarized Griffin's hearing testimony and Adult Function Reports regarding his symptoms. (Tr. 26). The ALJ determined "the claimant's statements concerning the intensity, persistence and limiting effects of [the alleged] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (*Id.*). In so finding, the ALJ did not improperly discredit Griffin's subjective complaints. The ALJ satisfied the Eleventh Circuit pain standard by stating Griffin's medically determinable impairments could reasonably be expected to produce some of the symptoms he alleged, yet Griffin's descriptions regarding the disabling extent of his symptoms did not entirely accord with the medical evidence of record. (*Id.*). The ALJ detailed medical evidence from October 2016 to March 2023 to support his decision, highlighting records indicating Griffin's pain remained well-managed with medication and other treatment methods. (Tr. 27-29). The ALJ adequately articulated these findings, and substantial evidence supports them.

In determining whether a claimant is disabled under the aforementioned pain standard, an ALJ may consider evidence from before or after the relevant period between the alleged onset date of his disability and the date last insured, so long as the

information bears on the claimant's disability during the relevant time. *Douglas v. Commissioner of Soc. Sec.,* 486 Fed. App'x 72, 75 (11th Cir. 2012) ("[The ALJ] properly applied this circuit's pain standard, taking into account evidence during the relevant period. He also considered evidence from before and after the relevant period that would have bearing on Douglas's disability during the relevant time."). To this end, the full medical record—including those pre-dating the alleged onset date and post-dating the date last insured—demonstrate Griffin's symptoms of pain stemming from degenerative disc disease, degenerative joint disease, and polyneuropathy remained relatively controlled throughout the relevant period.

On October 20, 2016, Griffin visited Sparks Orthopedics and Sports Medicine complaining of radiating and sharp right hip pain associated with groin pain and stiffness. (Tr. 277). He rated his pain as a 6 out of 10. (*Id.*). The examining physician recorded normal gait, groin pain with range of motion, trochanteric tenderness, and tenderness to palpation of the right lumbar paraspinal region. (*Id.*). X-ray results demonstrated normal alignment of the pelvis, acetabular osteophytes on the right, and moderate joint space narrowing on the right. (Tr. 278). "Visual inspection of the lower lumbar spine reveal[ed] lumbar spine degenerative changes." (*Id.*). The examining physician counseled Griffin on both non-surgical and surgical treatment options, including lifestyle modification, exercise and physical therapy, weight management, supportive devices, intraarticular steroid injection, and total hip replacement "for [patients] that have failed conservative management." (*Id.*). Griffin opted to engage in

conservative management of his pain.  (*Id.*).

In a patient communication from Sparks Orthopedics and Sports Medicine dated November 9, 2016, the examining physician noted Griffin should come in for an injection "if meloxicam and tramadol are not helping." (Tr. 276).

Grandview Medical Group records dating March 27, 2017, indicate Griffin presented to a clinic with complaints of chronic worsening back pain affecting his quality of sleep and activities of daily living. (Tr. 290).  Griffin identified "right sided back pain which radiates anteriorly down [his right lower extremity] to the knee occasionally to the foot with cramping at the ball of his right foot." (*Id.*).  In addition, he reported occasional right lower extremity weakness. (*Id.*).  He denied sustaining an injury prior to pain onset, having trouble walking, or experiencing bowel or bladder dysfunction. (*Id.*).  Griffin reportedly took Norco and Lyrica with no symptom relief. (*Id.*).  The examining physician noted Griffin exhibited normal gait. (Tr. 291).  A lumbar MRI revealed a herniated disc at T11, collapse of the T12 intervertebral disk, mild spinal stenosis at L3, and moderate spinal stenosis at L4.  (291, 294).  The physician recommended a lumbar epidural steroid injection and advised Griffin to return two weeks after receiving the treatment.  (Tr. 291, 298).

On April 23, 2021, after the onset date of the alleged disability, Griffin visited Alabama Anesthesiology and Pain Consultants to complain of pain in his back and right hip radiating to his right leg and foot. (Tr. 329).  He estimated experiencing such pain for four years and described its onset as gradual.  (*Id.*).  He described his pain as

16

constant, aching, numbing, sharp, shooting, and tingling. (*Id.*). On a scale of 1 to 10, he rated his pain as a 7 on average—6 at its least and 8 at its worst. (*Id.*). Griffin stated bending, going up stairs, going down stairs, lifting, sitting, and driving aggravated his pain. (Tr. 329, 333). Conversely, he stated medications alleviated his pain, and he described his current regimen as "alternating acetaminophen and aspirin." (Tr. 329, 333). Griffin confirmed a history of vertigo and dizziness. (Tr. 329). He described waking up at night due to pain. (*Id.*). He stated previous medications and treatments— including anti-inflammatories, beta-blockers, Flexeril/cyclobenzaprine, hydrocodone, Lyrica, muscle relaxants, Neurontin/gabapentin, Ultram, and exercises— "[had] not helped much." (*Id.*).

Griffin reported muscle pain, muscle cramps, muscle weakness, back pain, joint pain, joint stiffness, morning stiffness, and night cramps. (Tr. 330). However, he denied any limitation of joint movements. (*Id.*). Upon examination of the cervical spine, the physician noted normal curvature, no pain upon palpation of the cervical facet, no pain "when the neck is flexed anteriorly," and no pain "with cervical spine extension." (Tr. 331). Relatedly, the physician described the cervical spine as supple and stable, and he noted full anterior flexion at 60 degrees and full extension at 75 degrees. (*Id.*).

Examination of the thoracic spine returned the following findings: no evidence of atrophy or asymmetry, no tenderness at the thoracic paraspinal muscles or facet joint lines, and normal range of motion upon flexion and extension. (*Id.*). In addition, the

physician noted "[t]here is evidence of crepitation, laxity or instability noted in the thoracic spine." (*Id.*).

Examination of the lumbar spine revealed no evidence of scoliosis and no pain upon palpation of the lumbar intervertebral spaces, bilateral sacroiliac joint area, or greater trochanteric bursa. (*Id.*). However, the physician noted pain upon palpation of both sides of the L3-S1 region. (*Id.*). Griffin exhibited full anterior flexion at 90 degrees with no pain. (*Id.*).

Griffin declared he did not desire blocks or surgery. (Tr. 333). The examining physician ordered NCV (nerve conduction velocity) testing of the lower extremities, lumbar x-rays, and physical therapy. (Tr. 325, 333). In addition, the physician prescribed trials of Diclofenac and Tylenol 3. (Tr. 333). Finally, he stated he would "check on a back brace." (*Id.*).

Griffin received an x-ray of his lumbar spine. Radiology notes dated April 26, 2021, revealed the following findings: minor scoliosis, minor mid abdominal aortic atherosclerosis and osteophytic changes in the mid and lower thoracic interspaces, moderate disc space height loss at 4/5 with minor endplate sclerosis, minor lower facet degenerative joint disease, minimal 5/1 and sacroiliac joint sclerosis, and minimal central and anterior partial compression at T12. (Tr. 335, 380, 468).

On that same date, April 26, 2021, Griffin presented to The Clinic of Gadsden to establish care with a primary care physician. (Tr. 365, 440). The examining physician assessed type 2 diabetes mellitus with unspecified complications, essential hypertension,

and hyperlipidemia. (*Id.*). He ordered a series of lab tests. (Tr. 366, 441).

Griffin visited The Clinic of Gadsden for follow-up on May 3, 2021. (Tr. 368, 443). Pertinently, the examining physician assessed chronic fatigue, type 2 diabetes mellitus with unspecified complications, and essential hypertension. (Tr. 370, 445). He scheduled a four-week follow up to review Griffin's blood sugar log after starting Trulicity. (*Id.*).

On June 7, 2021, Griffin visited The Clinic of Gadsden to discuss recent labs. (Tr. 372, 447). The examining physician described a recent x-ray exhibiting degenerative joint disease of the lumbar spine and acknowledged Griffin's continued complains of lower back pain. (*Id.*). He ordered a four-week follow up to review Griffin's blood sugar log and discuss increasing his Trulicity prescription. (Tr. 373, 448).

On June 11, 2021, Griffin presented at The Clinic of Gadsden to complain of "restlessness accompanied by a sore skin lesion on his left calf." (Tr. 375, 451). The examining physician assessed cellulitis of Griffin's lower extremity and prescribed Bactrim. (*Id.*).

On June 23, 2021, Griffin visited Alabama Anesthesiology and Pain Consultants. (Tr. 313). The examining physician noted a past medical history of chronic pain syndrome, long-term opiate use, other pain disorders related to psychological factors, hypertension, degenerative disc disease of the lumbar spine, lumbar radiculopathy, paresthesia of the foot, pain of the left lower extremity, and pain of the right lower

extremity. (*Id.*).

On June 25, 2021, Griffin received a nerve conduction and somatosensory evoked potential testing of both lower extremities at Coosa Pain and Wellness. (Tr. 394, 411, 470). The tests revealed "findings consistent with a primarily sensory polyneuropathy." (*Id.*). The physician recommended an MRI. (*Id.*).

On July 1, 2021, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 350). Griffin reported continuous lower back pain aggravated by prolonged standing, walking, and sitting. (*Id.*). He denied any brace fitting within the previous three years or receiving NCV treatment within the previous six months. (*Id.*). Griffin reportedly attempted to manage his pain by resting. (*Id.*). He rated his pain as a 6 on a scale of 1-10 and estimated his medications relieved his pain by 40%. In addition, he noted his medications increased his ability to perform activities of daily living. (*Id.*).

He reported good sleep posture and 6-7 average hours of sleep per night. (*Id.*). He denied any side effects associated with his medications. (*Id.*). Griffin recalled receiving physical therapy in 1996, and he denied receiving blocks in the past. (*Id.*). He reported lower extremity numbness and weakness, back pain, joint pain, joint stiffness, joint swelling, and numbness. (Tr. 351). The examining physician assessed lumbar degenerative disc disease, lumbar radiculopathy, chronic pain syndrome, and long-term opiate use. (Tr. 352). He recorded "[n]o new pain complaints" and noted "[m]edication continues to help control pain and allows function." (Tr. 353). He increased Griffin's

Tylenol 3 dosage.

Griffin received an MRI of his lumbar spine. Radiology notes dated July 13, 2021, reveal the following impressions: moderate retroperitoneal and slightly lesser subcutaneous adipose changes, mild straightening of the normal lumbar lordotic curvature with multilevel disc degenerative joint disease, minimal anterior partial compression with edema at T11, disc space height loss of 11/12 and 4/5, mild facet degenerative joint disease at 3/4 and 5/1 with slightly greater facet changes at 4/5, and mild right and moderate left lateral recess narrowing and moderate bilateral foraminal narrowing caused by the combination of diffuse disc bulging and facet degenerative joint disease at 4/5. (Tr. 342, 361, 379, 467).

On July 20, 2021, Griffin visited The Clinic of Gadsden "to obtain [a] disability form . . . ." (Tr. 377). The examining physician acknowledged Griffin's history of lumbar degenerative disc disease "[c]onfirmed on [a] recent MRI." (*Id.*).

According to a physical therapy plan of care dated July 29, 2021, Griffin reported severe pain, severe loss of motion, and severe weakness in his right-sided low back radiating to his right lower extremity associated with a diagnosis of intervertebral disc degeneration of the thoracolumbar region. (Tr. 381). He described his pain as a dull ache. (*Id.*). Griffin reported prolonged sitting, going up stairs, and climbing ladders aggravated his pain. (*Id.*). Conversely, he reported medication and rest alleviated his pain. (*Id.*).

Griffin's physical therapist recommended a treatment plan including unattended

electrical stimulation, hot and cold packs, manual therapy, neuromuscular re-education, self-management, therapeutic activity, and ultrasound. (Tr. 382). The therapist scheduled treatment 3 times per week for 4 weeks. (*Id.*). In addition, the therapist recorded flexion, extension, and rotation goals for Griffin's lumbar spine, hip, and thoracic spine. (Tr. 382-383).

On August 2, 2021, Griffin visited The Clinic of Gadsden "for routine three month follow up of diabetic management." (Tr. 452). The examining physician noted an in-office A1C of 7.3%. (*Id.*). He assessed type 2 diabetes mellitus with unspecified complications, essential hypertension, and pain in the right knee. (Tr. 453). Griffin received x-rays of his knee. (*Id.*).

Griffin visited Alabama Anesthesiology and Pain Consultants on August 2, 2021, for a pain-management follow-up. (Tr. 404). Griffin reported continuous lower back pain aggravated by prolonged standing, walking, and sitting. (*Id.*). He denied any brace fitting within the previous three years or receiving NCV treatment within the previous six months. (*Id.*). Griffin reportedly attempted to manage his pain via rest and a brace. (*Id.*). He noted his medications reduced his pain and increased his ability to perform activities of daily living. (*Id.*). He reported good sleep posture and 6-7 average hours of sleep per night. (*Id.*). Griffin reported lower extremity numbness and weakness, back pain, joint pain, joint stiffness, joint swelling, and numbness. (Tr. 405). In addition, he noted physical therapy caused knee pain worse than his existing back pain. (Tr. 407). The examining physician assessed lumbar degenerative disc disease, lumbar

facet arthropathy, lumbar foraminal stenosis, lumbar radiculopathy, compression fracture of T11, chronic pain syndrome, and long-term opiate use. (Tr. 406). Although Griffin reported Tylenol 3 caused drowsiness, the examining physician noted "[m]edication continues to help control pain and allows function." (Tr. 407). He prescribed a trial of Tramadol and ordered a follow-up visit in a month to discuss the benefits of Tramadol and a possible lumbar epidural steroid injection at the L3-4 level. (Tr. 407-408).

On August 3, 2021, Griffin terminated his physical therapy treatment plan after attending a total of five sessions. (Tr. 479). He noted his functional activities of daily living declined from "within normal limits" to "severe impairment." (*Id.*). However, the physical therapist reported "[t]he patient's progress towards goals is good[,] … his tolerance to treatment is good," and his "discharge prognosis is good." (*Id.*).

On August 20, 2021, Griffin visited Therapy South with complaints of low back pain with radicular symptoms to the right posterior hip. (Tr. 475). The physical therapist assessed lumbar shift and decreased lumbar extension. (*Id.*). Treatment "[f]ocused on therapeutic exercise to left lumbar list correction and prone extension strategies in order to assist with [activities of daily living] and functional mobility." (*Id.*). The therapist outlined goals for pain management and range of motion improvements and recommended a treatment plan of three visits a week over a period of 12 weeks consisting of active assistive range of motion activities, active range of motion activities, activities, manual therapy techniques, neuromuscular re-education, passive range of

motion activities, stretching and flexibility activities, therapeutic activities, therapeutic exercise, and trigger point dry needling. (Tr. 475-476).

On August 31, 2021, Griffin underwent a urinary drug screening at Alabama Anesthesiology and Pain Consultants "to assess compliance with a prescription plan or evaluate potential for starting or continuing controlled medication." (Tr. 530).

Griffin presented at The Clinic of Gadsden on September 8, 2021, for a follow-up visit. (Tr. 455). He reported "physical therapy helps improve low back pain" but "symptoms … return shortly after completing therapy." (*Id.*). In addition, Griffin declared a TENS (transcutaneous electrical nerve stimulation) unit effectively treated his pain. (*Id.*). Griffin expressed reluctance to receive back surgery but confirmed interest in receiving an epidural. (*Id.*). That said, he wished to wait until the first of the year to receive an epidural due to cost and changes to his insurance. (*Id.*). The examining physician ordered a TENS unit and instructed Griffin to continue with physical therapy. (Tr. 456).

On September 27, 2021, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 524). Griffin reported continuous lower back pain aggravated by standing and walking. (*Id.*). He denied any brace fitting within the prior three years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted to manage his pain via rest and heat. (*Id.*). He rated his pain as a 5 on a scale of 1-10 and estimated his medications relieved his pain by 50%. In addition, he noted experiencing "less pain at times." (*Id.*). He reported good sleep posture and

5-6 average hours of sleep per night. (*Id.*). He denied any side effects associated with his medications. (*Id.*). Griffin recalled receiving physical therapy more than 20 years previously, and he denied receiving blocks in the past. (*Id.*). He reported lower extremity pain, leg pain while walking, lower extremity numbness and weakness, back pain, joint pain, and joint stiffness. (Tr. 525). The examining nurse practitioner remarked, "patient[']s pain and function improved significantly with current pain regimen." (Tr. 526). He ordered Griffin to continue taking Tramadol for pain management. (*Id.*).

Griffin presented for a follow-up visit at The Clinic of Gadsden on October 18, 2021. (Tr. 429, 457). Griffin reported his TENS unit provides him "some relief," but "any lengthy walks continue to worsen his pain." (*Id.*). The examining physician referred Griffin to another physician for "further evaluation and treatment of [degenerative disc disease] of [the] lumbar spine." (*Id.*).

On October 28, 2021, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 517). Griffin reported continuous lower back pain aggravated by bending over and attempting to rise back up. (*Id.*). He denied any brace fitting within the prior three years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted to manage his pain via rest and heat. (*Id.*). He rated his pain as a 6 on a scale of 1-10 and estimated his medications relieved his pain by 50%. In addition, he noted experiencing "less pain at times." (*Id.*). He reported good sleep posture and 5-6 average hours of sleep per night. (*Id.*). He denied

any side effects associated with his medications. (*Id.*).

Griffin recalled receiving physical therapy more than 20 years previously, and he denied receiving blocks in the past. (*Id.*). He reported lower extremity pain spreading from the right side to the left side, leg pain while walking, lower extremity numbness and weakness, back pain, joint pain, and joint stiffness. (Tr. 518). The examining physician recorded "[n]o new pain comments" and noted "[m]edication continues to help control pain and allows function." (Tr. 520). Griffin expressed interest in switching his Tramadol prescription to Norco. (*Id.*). The physician discontinued Griffin's Tramadol prescription and prescribed a trial of Norco. (*Id.*). In addition, he prescribed Narcan. (*Id.*).

On November 15, 2021, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 506, 557). Griffin reported continuous lower back pain aggravated by increased activities. (*Id.*). He denied any brace fitting within the prior three years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted to manage his pain via a heating pad and rest. (*Id.*). He rated his pain as a 7 on a scale of 1-10 and estimated his medications relieved his pain by 30%. In addition, he noted experiencing "less pain at times." (*Id.*). He reported fair sleep posture and 4-5 average hours of sleep per night. (*Id.*). He denied any side effects associated with his medications. (*Id.*).

Griffin recalled receiving physical therapy more than 20 years previously, and he denied receiving blocks in the past. (*Id.*). He reported lower extremity pain spreading

from the right side to the left side, leg pain while walking, lower extremity numbness and weakness, back pain, joint pain, and joint stiffness. (Tr. 507, 558). The examining physician recommended Griffin consider MBB (medical branch block) and RFA (radiofrequency ablation) procedures. (Tr. 509, 560). He noted Griffin's recent dental work resulted in more acute pain and temporarily increased Griffin's Norco prescription until he could receive intervention. (*Id.*).

On December 10, 2021, Griffin visited The Clinic of Gadsden for a follow-up visit. (Tr. 460). Griffin expressed a desire "to attempt dietary and lifestyle changes to improve [his] A1C." (*Id.*). The examining physician instructed Griffin to continue his current medications but noted adjustments may prove necessary if Griffin's diabetic measurement did not "significantly improve[]." (Tr. 461).

On December 16, 2021, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 497, 549). Griffin reported continuous lower back pain aggravated by increased activities. (*Id.*). He denied any brace fitting within the prior three years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted to manage his pain via a heating pad. (*Id.*). He rated his pain as a 5 on a scale of 1-10 and estimated his medications relieved his pain by 50%. In addition, he noted experiencing "[o]verall reduced pain." (*Id.*). He reported fair sleep posture and 4-5 average hours of sleep per night. (*Id.*). He denied any side effects associated with his medications. (*Id.*).

Griffin recalled physical therapy caused pain in his knee in the previous four

months, and he denied receiving blocks in the past. (*Id.*). He reported lower extremity pain in his left knee, lower extremity pain at rest, leg pain while walking, tingling in the legs or feet, neck pain, back pain, and joint pain. (Tr. 498, 550). Griffin expressed a desire to change his medications, but the examining physician instructed Griffin to continue with Norco. (Tr. 500, 552).

On January 20, 2022, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 489, 540). Griffin reported continuous lower back pain aggravated by increased activities. (*Id.*). He denied any brace fitting within the prior three years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted to manage his pain via rest and heat. (*Id.*). He rated his pain as a 7 on a scale of 1-10 and estimated his medications relieved his pain by 30%. In addition, he noted experiencing "[l]ess pain at times." (*Id.*). He reported fair sleep posture and 4-6 average hours of sleep per night. (*Id.*). He denied any side effects associated with his medications. (*Id.*). Griffin reported physical therapy made his pain worse5 months previously, and he denied receiving blocks in the past. (*Id.*).

Griffin asked the examining nurse practitioner to change his Norco prescription to Percocet. (Tr. 491, 542). The nurse refused, noting: "I did not think he really needs it based on our conversation," and "Medication continues to help control pain and allows function." (*Id.*). In addition, the nurse discontinued Griffin's diclofenac prescription due to complaints of drowsiness. (*Id.*). She scheduled a follow-up visit with a physician and included a warning to "watch [Griffin] closely." (*Id.*).

On February 17, 2022, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 650). Griffin reported continuous lower back pain aggravated by prolonged sitting. (*Id.*). He denied any brace fitting within the prior three years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted to manage his pain via rest and heat. (*Id.*). He rated his pain as a 6 on a scale of 1-10 and estimated his medications relieved his pain by 40%. In addition, he noted experiencing reduced pain and increased activities of daily living with medication. (*Id.*). He reported good sleep posture and above eight average hours of sleep per night. (*Id.*). He denied any side effects associated with his medications. (*Id.*). Griffin reported last receiving physical therapy six months before the visit, and he denied receiving blocks in the past. (*Id.*). He reported lower extremity coldness, lower extremity numbness and weakness, muscle pain, muscle cramps, back pain, and numbness. (Tr. 651). The examining physician ordered an x-ray and MRI of Griffin's lumbar spine and prescribed Butrans. (Tr. 653).

Griffin received an MRI of his lumbar spine on February 21, 2022, revealing minor scoliosis and degenerative joint disease. (Tr. 583, 643, 731). The interpreting radiologist noted disc space height loss at 4/5, mild to moderate associated lower facet and minor sacroiliac joint sclerotic changes, and atherosclerosis. (*Id.*).

On March 17, 2022, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 638). Griffin reported continuous back pain aggravated by increased activity. (*Id.*). He denied any brace fitting within the prior three

years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted to manage his pain via rest, heat, and pain cream. (*Id.*). He rated his pain as a 6 on a scale of 1-10 and estimated his medications relieved his pain by 40%. In addition, he noted experiencing "less pain at times." (*Id.*). He reported good sleep posture and 6-8 average hours of sleep per night. (*Id.*). He denied any side effects associated with his medications. (*Id.*). Griffin reported last receiving physical therapy 6-7 months before the visit, and he denied receiving blocks in the past. (*Id.*). He reported lower extremity pain at rest, leg pain while walking, lower extremity numbness and weakness, muscle pain, back pain, joint pain, and joint stiffness. (Tr. 639).

The examining physician discontinued Griffin's Butrans prescription due to cost and increased his diclofenac prescription. (Tr. 641). In addition, he recommended a sacroiliac joint injection if Griffin did not respond well to non-steroidal anti-inflammatory drugs. (*Id.*).

Griffin presented to The Clinic of Gadsden for a sick visit on March 28, 2022. (Tr. 575). He reported cramps in his right foot and blood sugar readings in the 200s. (*Id.*). The examining physician assessed muscle spasm and chronic fatigue. (*Id.*). He prescribed a muscle relaxant and a trial of Jardiance. (Tr. 575-576). In addition, he scheduled a one-week follow-up visit to "increase [J]ardiance if needed." (*Id.*).

Griffin presented to The Clinic of Gadsden on April 11, 2022. (Tr. 578). The examining physician did not increase Griffin's Jardiance prescription. (Tr. 579).

On April 15, 2022, Griffin presented to Alabama Anesthesiology and Pain

Consultants for a follow-up visit. (Tr. 619). Griffin reported continuous lower back pain aggravated by increased activity. (*Id.*). He denied any brace fitting within the prior three years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted to manage his pain via pain cream, a heating pad, and rest. (*Id.*). He rated his pain as a 7 on a scale of 1-10 and estimated his medications relieved his pain by 30%. In addition, he noted experiencing "less pain at times." (*Id.*). He reported good sleep posture and 6-7 average hours of sleep per night. (*Id.*). He denied any side effects associated with his medications. (*Id.*). Griffin reported last receiving physical therapy eight months before the visit. (*Id.*). He reported lower extremity pain at rest, leg pain while walking, lower extremity numbness and weakness, muscle pain, back pain, joint pain, and joint stiffness. (Tr. 620). Specifically, he noted pain radiating down his right leg and into his foot. (Tr. 622).

The examining nurse practitioner stated Griffin's medications "help." (*Id.*). In addition, he recorded the following exchange: "patient states the [V]oltaren gel helps and he believes 'less is more' then in his next sentence tells me he had to take a 4th Norco yesterday[]." (*Id.*). Given Griffin's unwillingness to receive blocks or other procedures, the nurse instructed Griffin about the clinic's weaning policy and decreased Griffin's Norco prescription. (Tr. 622-623).

On May 3, 2022, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 606). Griffin reported continuous lower back pain aggravated by increased activity. (*Id.*). He denied any brace fitting within the prior

three years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted to manage his pain via rest, heat, and creams. (*Id.*). He rated his pain as a 7.6 out of 10 with medications and estimated his medications relieved his pain by 30%. He noted experiencing "less pain at times." (*Id.*). He reported fair sleep posture and 5-7 average hours of sleep per night. (*Id.*). He denied any side effects associated with his medications. (*Id.*). Griffin reported last receiving physical therapy nine months before the visit. (*Id.*). He reported lower extremity pain, leg pain while walking, tingling in the legs or feet, lower extremity numbness and weakness, muscle pain, back pain, and joint pain. (Tr. 607). Griffin confirmed his medications "continue[d] to relieve [his] pain and improve function and [quality of life]." (Tr. 609). In addition, he discussed plans to receive chiropractic care. (*Id.*). The examining physician outlined a plan to wean Griffin's medications "as tolerated." He made no changes to Griffin's prescriptions. (*Id.*).

A radiographic examination of the lumbosacral spine dated May 23, 2022, revealed the following findings: moderate disc space narrowing at the L1-L2, L2-L3, and L5-S1 segmental levels; severe disc space narrowing at the L3-L4 and L4-L5 levels; moderate regional listing to right lateral; moderate hypolordosis of the lumbar sagittal curvature; moderate left-sided lumbar spinous rotation; osteoarthritis over anterior elements of L1, L2, and anterior, left lateral, and right lateral elements of L3, L4, and L5; and a left sacral deficiency of 1 millimeter. (Tr. 663).

On May 23, 2022, Griffin received care at McClellan Family Chiropractic. (Tr.

657).  Griffin presented to the clinic with complaints of dorsal pain, lumbar pain, sacroiliac joint pain, right leg pain, and right leg tingling aggravated by walking.  (*Id.*).  A "[r]ange of motion exam revealed a decrease in the cervical spine [and] decrease in the thoracic spine."  (*Id.*).  Griffin described his pain as sharp.  (*Id.*).  In addition, he stated a recent visit to Alabama Anesthesiology and Pain Consultants aggravated his pain and prompted a trip to his primary care doctor to receive a muscle relaxer.  (*Id.*).  He confirmed using an ointment and a heating pad to relieve his pain.  (*Id.*).

The chiropractor performed manipulations to the thoracic, lumbar, pelvis, and sacrum regions.  In addition, he applied electrical stimulation to "release … the body's natural endorphins and encephalins, … aid[] in pain control, decrease[] muscle spasms[,] and help[] … restore muscle function."  (*Id.*).  The chiropractor also performed decompression of the lumbar spine, extremity adjustments on the hips, and instructed Griffin on home icing and biofreeze.  (*Id.*).

On subsequent visits to McClellan Family Chiropractic, Griffin reported that repetitive movements, bending and lifting heavy objects, arising from a seated or lying position, and performing yard work aggravated his pain.  (Tr. 657-659).  On May 27, Griffin described his pain as "better since [his] last visit."  (Tr. 657).  On May 31, June 1, June 6, and June 10, he described his pain as aching, tight, or dull.  (Tr. 657-659).  During each visit, the chiropractor identified swollen fibers in Griffin's lumbar spine and performed manipulations to the thoracic, lumbar, pelvis, and sacrum regions.  (*Id.*).  In addition, he applied electrical stimulation to "release … the body's natural

endorphins and encephalins, … aid[] in pain control, decrease[] muscle spasms[,] and help[] … restore muscle function." (*Id.*). The chiropractor instructed Griffin on daily exercises, home icing, proper sleeping posture, and home biofreeze. (*Id.*).

On May 31, 2022, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 598). Griffin reported continuous lower back pain aggravated by increased activity. (*Id.*). He denied any brace fitting within the prior three years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted to manage his pain via rest, heat, and creams. (*Id.*). He rated his pain as a 6 out of 10 without medications and estimated his medications relieved his pain by 40%. (*Id.*). He noted experiencing "less pain at times." (*Id.*). He reported good sleep posture and 6-7 average hours of sleep per night. (*Id.*). He denied any side effects associated with his medications. (*Id.*). Griffin reported last receiving physical therapy 10-11 months before the visit. (*Id.*). He reported lower extremity pain at rest, leg pain while walking, tingling in the legs or feet, lower extremity coldness, muscle pain, back pain, joint pain, and joint stiffness. (Tr. 599). Griffin stated 80 Norco tablets "[was] not enough to last [3 times] daily." (Tr. 601). The examining nurse practitioner increased Griffin's Norco prescription to 90 tablets with instructions to "wean as tolerated." (*Id.*).

Griffin visited The Clinic of Gadsden on July 11, 2022, complaining of pain in the ball of his foot moving to the top of his foot. (Tr. 682). The examining physician ordered an x-ray of Griffin's foot and instructed Griffin to use the ibuprofen and Norco

"he already has at home" for pain management.  (*Id.*).

Griffin visited The Clinic of Gadsden on July 11, 2022, to review his x-rays.  (Tr. 685).  The images "show[ed] calcifications and [degenerative joint disease] of [the] fifth metatarsal."  (Tr. 685, 691).  The examining physician noted "previously prescribed ibuprofen improved symptoms."  (Tr. 685).

On July 21, 2022, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit.  (Tr. 726).  Griffin reported continuous back pain aggravated by increased activity.  (*Id.*).  He denied any brace fitting within the prior three years or receiving NCV treatment within the prior six months.  (*Id.*).  Griffin reportedly attempted to manage his pain via rest, heat, and cream.  (*Id.*).  He rated his pain as a 6 out of 10 without medications and estimated his medications relieved his pain by 40%.  (*Id.*).  In addition, he noted experiencing "less pain at times."  (*Id.*).  He reported good sleep posture and 7 average hours of sleep per night.  (*Id.*).  He denied any side effects associated with his medications.  (*Id.*).  Griffin reported receiving chiropractic care twice weekly.  (*Id.*).  He reported lower extremity pain at rest, leg pain while walking, tingling in the legs or feet, lower extremity numbness and weakness, muscle pain, back pain, joint pain, and joint stiffness.  (Tr. 727).  Griffin stated his chiropractic visits only helped him "2-3 hours at a time."  (Tr. 729).  In addition, he stated "the TENS unit helps more than anything at the chiropractor."  (*Id.*).  The examining nurse practitioner ordered a TENS unit for Griffin's home and switched his Norco prescription to Percocet because "he lives with his mom, who is on Norco as well."  (*Id.*).  Griffin confirmed his

medications continued to improve his low back pain and overall quality of life. (*Id.*).

On August 18, 2022, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 713). Griffin reported continuous low back pain aggravated by increased activity. (*Id.*). He denied any brace fitting within the prior three years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted chiropractic care to manage his pain. (*Id.*). He rated his pain as a 6 out of 10 with medications and a 7 without medications. (*Id.*). He estimated his medications relieved his pain by 10% but confirmed experiencing "less pain at times." (*Id.*). He reported good sleep posture and six average hours of sleep per night. (*Id.*). He listed constipation as a side effect associated with his medications. (*Id.*). Griffin reported last receiving physical therapy one year before the visit. (*Id.*). He reported lower extremity pain at rest, leg pain while walking, tingling in the legs or feet, back pain, joint pain, and joint swelling. (Tr. 714). Griffin expressed a belief that "Percocet is not adequate." (Tr. 717). The examining nurse practitioner informed Griffin that Percocet provides more coverage than Norco and administered a Toradol injection "for better back pain coverage." (*Id.*).

On September 15, 2022, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 705). Griffin reported continuous back pain aggravated by increased activity. (*Id.*). He denied any brace fitting within the prior three years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted to manage his pain via rest and heat. (*Id.*). He rated his pain as a 5 out of 10

with medications.  (*Id.*).  He estimated his medications relieved his pain by 30% and confirmed experiencing "less pain at times." (*Id.*).  He reported good sleep posture and 6-8 average hours of sleep per night.  (*Id.*).  He denied any side effects associated with his medications.  (*Id.*).  Griffin reported receiving chiropractic care twice a week.  (*Id.*).  He reported lower extremity pain at rest, leg pain while walking, tingling in the legs or feet, muscle cramps, back pain, joint pain, and joint stiffness.  (Tr. 706).  Griffin complained of inadequate pain coverage on Percocet.  (Tr. 708).  The examining physician increased Griffin's Percocet prescription "for improved pain coverage." (*Id.*).

On September 20, 2022, Griffin presented at The Clinic of Gadsden with complaints of chronic diarrhea.  (Tr. 688).  The examining physician prescribed Loperamide but noted Griffin would "hold on taking this medication for the time being." (Tr. 688-689).

On October 19, 2022, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit.  (Tr. 811).  Griffin reported continuous low back pain aggravated by prolonged standing, walking, and sitting.  (*Id.*).  He denied any brace fitting within the prior three years or receiving NCV treatment within the prior six months.  (*Id.*).  Griffin reportedly attempted to manage his pain via rest and heat.  (*Id.*).  He rated his pain as a 6 out of 10, and he estimated his medications relieved his pain by 40%.  (*Id.*).  He confirmed experiencing reduced pain and increased activities of daily living with medication.  (*Id.*).  He reported good sleep posture and six average hours of sleep per night.  (*Id.*).  Griffin reported receiving physical therapy in the spring of 2022,

and he denied receiving a previous block. (*Id.*). He reported back pain, joint pain, joint stiffness, joint swelling, and numbness. (Tr. 812). Griffin stated the increase in his medication dosage "improved his pain," "decrease[d] low back and [sacroiliac joint] pain," and improved his quality of life. (Tr. 814). He reported seeing another physician for "issues with [his] right elbow" and stated he may require surgery to remove a spur. (*Id.*). The examining nurse practitioner outlined a plan to wean Griffin's medications "as tolerated." (*Id.*).

On November 15, 2022, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 802). Griffin reported continuous back pain aggravated by increased activity. (*Id.*). He denied any brace fitting within the prior three years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted to manage his pain by placing a pillow between his legs. (*Id.*). He rated his pain as a 6 out of 10 with medication and a 9 without medication. (*Id.*). He estimated his medications relieved his pain by 30% and confirmed experiencing "less pain at times." (*Id.*). He reported good sleep posture and seven average hours of sleep per night. (*Id.*). He denied any side effects associated with his medications. (*Id.*). Griffin reported last receiving physical therapy within the past year. (*Id.*). He reported lower tingling in the legs or feet and back pain. (Tr. 803).

Upon musculoskeletal examination, the examining nurse practitioner noted no abnormalities of the cervical spine and no abnormalities of the lumbar spine. (Tr. 803-804). Griffin's right trochanteric bursa appeared tender to palpation. (Tr. 804). Griffin

reported muscle spasms in his lower back radiating down his right leg and joint achiness. (Tr. 806). The nurse practitioner ordered a TENS unit and prescribed Mobic. (*Id.*). She outlined a plan to wean Griffin's medications "as tolerated." (*Id.*).

On December 13, 2022, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 792). Griffin reported continuous back and sacroiliac pain aggravated by increased activity. (*Id.*). He denied any brace fitting within the prior three years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted to manage his pain via rest and heat. (*Id.*). He rated his pain as a 7 out of 10 and estimated his medications relieved his pain by 30%. (*Id.*). He confirmed experiencing "less pain at times." (*Id.*). He reported good sleep posture and 6-8 average hours of sleep per night. (*Id.*). He denied any side effects associated with his medications. (*Id.*). Griffin reported last receiving physical therapy within the year. (*Id.*). He reported leg pain while walking, tingling in the legs or feet, lower extremity numbness and weakness, muscle pain, back pain, and joint pain. (Tr. 793). Griffin confirmed his current medication "continues to relieve his pain and improve function and [quality of life]." (Tr. 795).

On January 17, 2023, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 783). Griffin reported continuous upper right hip pain aggravated by increased activity. (*Id.*). He denied any brace fitting within the prior three years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted to manage his pain via use of a TENS unit. (*Id.*). He rated his

pain as a 5.5 out of 10 with medication and estimated his medications relieved his pain by 0%. (*Id.*). He confirmed experiencing "less pain at times." (*Id.*). He reported good sleep posture and eight average hours of sleep per night. (*Id.*). He denied any side effects associated with his medications. (*Id.*). He reported tingling in the legs or feet, back pain, joint pain, and joint stiffness. (Tr. 784).

The examining nurse practitioner noted that Griffin "has been managing his back pain with [P]ercocet" with "some decrease in pain and improved function." (Tr. 786; *see also id.* ("Patient[']s pain and function improved significantly with current medication regimen. Goals being reached.")). He outlined a "weaning plan at 5-10% every 2 months as tolerated." (*Id.*).

On January 24, 2023, Griffin visited The Clinic of Gadsden to follow up on labs and obtain prescription refills of his type 2 diabetes medications. (Tr. 734).

On February 14, 2023, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 769). Griffin reported continuous lower back and right sacroiliac joint pain aggravated by prolonged standing, walking, and sitting. (*Id.*). He denied any brace fitting within the prior three years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted to manage his pain via heat and rest. (*Id.*). He rated his pain as a 6 out of 10 and estimated his medications relieved his pain by 40%. (*Id.*). He confirmed experiencing "less pain at times with medication." (*Id.*). He reported good sleep posture and 5-6 average hours of sleep per night. (*Id.*). He listed constipation as a side effect associated with his

medications. (*Id.*). He reported muscle pain, muscle cramps, back pain, joint pain, joint stiffness, and joint swelling. (Tr. 770). Griffin explained his lumbar spine constituted the main source of his pain. (Tr. 772). However, he confirmed his current medications "allow [him] to have improved quality of life." (*Id.*). The examining nurse practitioner ordered an updated MRI and outlined a weaning plan "consist[ing] of decreasing medications as tolerated … post interventional treatment." (*Id.*).

Griffin received an MRI on February 16, 2023. (Tr. 748, 761). The reviewing radiologist noted the following findings: (1) chronic anterior wedge compression deformity of the superior endplate of T12 vertebra with a large Schmorl's node, with an associated decrease in the height of the vertebra anteriorly; (2) diffuse 5 millimeter disc bulge, moderate bilateral facet hypertrophy, mild canal stenosis, and moderate bilateral neuroforaminal narrowing at L4-L5; (3) focal 5 millimeter central disc protrusion and mild canal stenosis at T11-T12; (4) diffuse 2 millimeter disc bulge with focal 4 millimeter left foraminal disc protrusion, moderate right and mild left facet hypertrophy, and mild right and moderate left foraminal narrowing at L3-L4; (5) diffuse 2 millimeter disc bulge and mild bilateral facet hypertrophy at L1-L2; (6) moderate bilateral facet hypertrophy at L5-S1; and (7) mild bilateral facet hypertrophy at L2-L3. (Tr. 749, 762).

On March 14, 2023, Griffin presented to Alabama Anesthesiology and Pain Consultants for a follow-up visit. (Tr. 756). Griffin reported continuous back and left knee pain aggravated by increased activity. (*Id.*). He denied any brace fitting within the

prior three years or receiving NCV treatment within the prior six months. (*Id.*). Griffin reportedly attempted to manage his pain via rest, heat, and a TENS unit. (*Id.*). He rated his pain as a 4 out of 10 and estimated his medications relieved his pain by 60%. (*Id.*). He confirmed experiencing "less pain at times." (*Id.*). He reported good sleep posture and 6-8 average hours of sleep per night. (*Id.*). He listed constipation as a side effect associated with his medications. (*Id.*). He confirmed last receiving physical therapy 2 years before the visit. (Id.). He reported lower extremity pain at rest, leg pain while walking, tingling in the legs or feet, lower extremity numbness and weakness, muscle pain, back pain, joint pain, and joint stiffness. (Tr. 757). Griffin explained his lumbar spine and sacroiliac joint constituted the main sources of his pain. (Tr. 759). However, he confirmed his current medications "allow [him] to have improved quality of life." (*Id.*). The examining nurse practitioner discussed TF (transforaminal epidural steroid injection) and LESI (lumbar epidural steroid injection) procedures. (*Id.*). In addition, she outlined a weaning plan "consist[ing] of decreasing medications as tolerated … post interventional treatment." (*Id.*).

Griffin visited The Clinic of Gadsden on March 22, 2023, to complete disability paperwork. (Tr. 737).

The records above—considered as a whole—provide substantial evidence to support the ALJ's RFC determination, and the ALJ properly cited objective medical evidence refuting the severity of Griffin's alleged symptoms.

Regarding degenerative disc disease of the spine, degenerative joint disease of

the right hip, and polyneuropathy, Griffin testified he experiences sharp pain akin to "an icepick sticking in [him]" and numbness in his right big toe. (Tr. 47). He estimated he could stand for 30-40 minutes, sit upright for 30-45 minutes, walk 100 yards, and lift 15 pounds. (Tr. 49-50). Moreover, he estimated spending half of a typical day lying down. (Tr. 50). In an Adult Function Report, Griffin reported difficulty driving long distances, walking on uneven surfaces, and climbing stairs or ladders. (Tr. 210). He also reported difficulty getting out of bed, falling asleep, lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and pulling materials from one elevation to another. (Tr. 211, 215, 232, 233-234, 237).

Though aspects of the record certainly confirm symptoms of back and hip pain, substantial evidence suggests medications and other treatment methods significantly alleviated such symptoms. For example, records from Alabama Anesthesiology and Pain Consultants show Griffin's prescribed medications eased his pain, allowed him to perform activities of daily living, and/or improved his overall quality of life. (*See, e.g.,* tr. 526 ("[P]atient[']s pain and function improved significantly with current pain regimen."); tr. 786 ("Patient[']s pain and function improved significantly with current medication regimen."); tr. 814 ("[Griffin] [r]eports [medication increase] continues to decrease low back and [sacroiliac joint] pain and improves [quality of life]."); *see also* tr. 329, 353, 404, 407, 491, 520, 542, 609, 622, 650, 729, 759, 772, 795, 811). In addition, the record indicates Griffin often experienced "less pain at times" (tr. 489, 506, 517, 524, 540, 557, 598, 606, 619, 638, 705, 713, 726, 756, 769, 783, 792, 802) or "[o]verall

reduced pain" (tr. 497, 549). On March 14, 2023, three months prior to the date last insured, Griffin rated his pain as a 4 out of 10 and estimated his medications relieved his pain by 60%. (Tr. 756). Finally, Griffin's treatment plan included instructions to decrease narcotic dosages as tolerated. (Tr. 601, 609, 622, 759, 772, 786, 804, 814).

Griffin received physical therapy and chiropractic care with some symptom improvement. *See* tr. 455 (noting "physical therapy helps improve back pain" but "symptoms return shortly after completing therapy"); tr. 657 (describing pain as "better since last [chiropractic] visit"); tr. 657-659 (describing pain as "aching," "tight," or "dull" rather than "sharp" after first chiropractic visit); tr. 729 (stating chiropractic visits helped manage pain for "2-3 hours at a time"). In addition, he stated transcutaneous electrical nerve stimulation (TENS) reduced his pain. (Tr. 429, 455, 457, 729, 756).

As the ALJ indicated, Griffin elected not to receive surgery or blocks. (Tr. 333). On September 8, 2021, Griffin expressed reluctance to receive back surgery but confirmed interest in receiving an epidural. (Tr. 455). However, he wished to wait until the first of the year to receive an injection due to cost and changes to his insurance plan. (*Id.*). On August 18, 2022, Griffin received a Toradol injection (tr. 717), but the record does not contain any documentation of an epidural injection from the date of alleged disability to the date last insured. *See also* tr. 278 (Where examining physician counseled Griffin on surgical and non-surgical treatment options ranging from lifestyle modification to total hip replacement, Griffin opted for "conservative management."). Finally, as the ALJ observed, Griffin's examining physicians noted no postural

limitations consistent with total disability. (*See* tr. 28-29 ("[T]he record does not document standing, walking, lifting, or other postural limitations noted by providers during treatment that support the claimant's allegations.")).

Moreover, Griffin's testimony contains minor inconsistencies regarding his physical abilities and activity levels. For example, although Griffin testified walking to his jobsite aggravated his pain (tr. 48-49), he elsewhere explained walking "help[ed] loosen up [his] back at times." (Tr. 215; *see also* tr. 232 ("Walking short distances does help at times.")). Moreover, Griffin's Adult Function Reports indicate Griffin could mow the grass occasionally, care for his elderly mother and her dog, prepare meals, administer medication, wash clothes, and vacuum. (Tr. 211-212, 234). Griffin also reported going outside daily "[i]f only for a walk in the yard with the dog" (tr. 213-214), and he described attending American Legion meetings once a month and "going to the dances" twice a month. (Tr. 236).

The ALJ also properly evaluated all medical source opinions. On May 14, 2022, Griffin underwent a Social Security Disability Consultive Examination. (Tr. 585). The report confirmed Griffin could perform all listed activities of daily living, including cooking and meal preparation, personal care, housekeeping and laundry, shopping and banking, and driving. (*Id.*). On physical examination, Griffin reportedly exhibited 5 out of 5 strength in all extremities. (Tr. 587). In addition, he experienced no difficulty rising from the examination table, walking on his heels, walking on his toes, squatting and rising, or placing a finger to his nose. (Tr. 587-588). The examining physician

reported "[p]araspinal muscle tenderness in the low back" (tr. 587) but otherwise noted Griffin could "perform all physical activities of [the] examination" with no attendant functional limitations  (tr. 590).

The ALJ found the afore-described medical source opinion "only moderately persuasive" because "the report is somewhat lacking in functional limitations."  (Tr. 29).  As such, the ALJ accounted for the opinion in his RFC assessment only to the extent it accorded with his own conclusions vis-à-vis Griffin's limitations.

James P. Bailey, MD, authored a medical assessment on May 24, 2022.  (Tr. 62). Bailey opined "[t]he claimant's [medically determinable impairments] could reasonably be expected to produce the alleged symptoms, but the intensity of the symptoms and their impact on functioning are not consistent with the totality of the evidence."  (Tr. 65).  Bailey thus determined Griffin could perform work at a reduced medium residual functional capacity.  (Tr. 66-67).

Robert G. Haas, MD, authored a similar medical assessment on October 25, 2022.  (Tr. 70).  Haas opined "the severity of [Griffin's] alleged limitations are not wholly consistent with the medical evidence presented in [the] file."  (Tr. 73-74). Accordingly, he determined Griffin could perform work at a reduced medium residual functional capacity.  (Tr. 74-76).

The ALJ considered the opinions of the foregoing two state medical consultants and deemed them "only partially persuasive because they are supported by and consistent with the evidence available at the time of their reviews."  (Tr. 30).  That is,

the ALJ accounted for these opinions in his RFC assessment only inasmuch as they comported with medical records post-dating the assessments. (*See id.* ("[M]ore recent evidence is more persuasive and supported additional limitations.")).

The ALJ considered an attending physician statement dated February 9, 2023. (Tr. 733). The examining physician noted pain upon flexion, extension, rotation, and sitting for long periods. (*Id.*). Griffin's plan of treatment reportedly consisted of "continu[ing] with pain management until surgical intervention is required." (*Id.*). Regarding Griffin's prospects for improvement, the physician stated, "current treatment will improve physical and [unreadable] function, yet will not ultimately resolve condition." (*Id.*). That said, he confirmed Griffin could perform all activities of daily living (dressing, eating, bathing, toileting, continence, transferring), albeit "much slower." (*Id.*). Finally, the physician stated, "[Griffin's] condition is not likely to improve long term." (*Id.*).

The ALJ did not consider the attending physician statement a medical source opinion under the current regulations because the physician did not prepare the report for disability purposes and "[did] not specify what the claimant can still do despite his impairments and whether he has one or more impairment-related limitations or restrictions in abilities to perform certain demands of work." (Tr. 29-30 (citing 20 CFR 404.1513(a)(2) and 416.913(a)(2))). Supposing the statement constituted a medical source opinion, the ALJ found the provider's findings "contradicted by the claimant's own admissions in the record." (Tr. 30). Indeed, according to his own Adult Function

Reports, Griffin could dress, eat, and bathe without attendant limitations. (*See* tr. 211-212; 233-234). Regarding using the restroom, Griffin reported constipation associated with his medications (tr. 713), but he also stated over-the-counter medications helped alleviate his symptoms (tr. 717). Finally, although Griffin stated, "getting out of bed can be hard" (tr. 211) and "some mornings [it's] all I can do to get out of bed" (tr. 234), he also reported walking outside daily (tr. 214, 235), performing yardwork and housework (tr. 211-212, 233-234), and "going to the dances" (tr. 236). Thus, the ALJ properly assessed the physician's findings because they did not fully comport with the entire record.

The ALJ discussed many—though certainly not all—of the foregoing records. Accordingly, Griffin asserts the ALJ selectively evaluated the medical record and failed to consider evidence consistent with his own allegations. *See Robinson v. Colvin*, No. 5:12-cv-1954-AKK, 2014 WL 2214294203, at *5 (N.D. Ala. May 28, 2014) ("[I]t was unreasonable for the ALJ to rely only on the small snapshot of treatment notes that showed improvement immediately after [claimant's] back surgery, and to ignore the later notes outlining the return of [claimant's] pain.").

As an initial matter, the ALJ need not explicitly discuss every potentially relevant medical record. *See Brito v. Comm'r, Soc. Sec. Admin.,* 687 F. App'x 801, 804 (11th Cir. 2017) ("Although [claimant] points to other evidence in the record that was consistent with her hearing testimony and to which the ALJ did not specifically refer in making her credibility determination, the ALJ was not required to examine or reference every

piece of evidence, so long as it is evident, as it is here, that the ALJ considered [her] medical condition as a whole.").

Contrary to Griffin's contention, the ALJ did not cherry-pick the records to support his own conclusion.  First, the ALJ did not improperly disregard evidence buttressing Griffin's testimony.  In fact, he noted several instances in which Griffin complained of adverse symptoms.  For example, the ALJ cited objective findings of spine abnormalities on MRI and x-ray images, Griffin's self-reported symptoms of pain, and statements in which Griffin averred his medications only improved his pain by a small percentage.  (Tr. 27-28).

Second, the ALJ assessed a residual functional capacity including significant functional limitations.  In particular, the ALJ determined Griffin exhibited the RFC "to perform light work as defined in 20 C.F.R. 404.1567(c) except he can never climb ladders, ropes, or scaffolds"; "[h]e can occasionally stoop, kneel, crouch, or crawl"; "[h]e cannot be exposed to excessive vibration"; and "[h]e can never be exposed to workplace hazards such as moving mechanical parts and high, exposed places."  (Tr. 26).  As such, substantial evidence in the record supports the RFC determination vis-à-vis Griffin's impairments.

In sum, Griffin has not successfully undermined the substantial evidence supporting the ALJ's RFC assessment.  Although Griffin maintains his symptoms limit him to a greater degree than the ALJ assessed, the court cannot reweigh the evidence or second-guess the ALJ's conclusions.  *See Winschel,* 631 F.3d at 1178 (citations and internal

quotation marks omitted). The ALJ did not err in assessing Griffin's subjective complaints.

II. THE ALJ ERRED IN FAILING TO CONSIDER MANDATORY NARCOTICS TESTING AS A REQUIREMENT OF GRIFFIN'S PAST RELEVANT WORK.

"The ALJ assesses the claimant's RFC to determine whether the claimant can perform past relevant work despite his impairment." *Battle v. Astrue,* 243 Fed. App'x 514, 522 (11th Cir. 2007) (citing 20 C.F.R. §§ 404.1520(f), 416.920(f); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)). "To support a conclusion that the claimant is able to return to his past relevant work, the ALJ must consider *all the duties of that work* and evaluate the claimant's ability to perform them in spite of his impairments." *Id.* (citing *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir. 1990)) (emphasis added); *see also* SSR 24-2p, 89 Fed. Reg. 48479 (June 6, 2024) ("To determine whether an individual can perform PRW, we need information about the physical and mental demands of PRW, particularly as relevant to the individual's RFC. This may include detailed information about strength, manipulative ability, mental demands, and other job requirements.").

In making this determination at step four, the ALJ must develop the record and resolve any evidentiary conflicts that arise. *See Battle,* 243 Fed. App'x at 523 ("When deciding the case, it is the ALJ's duty to weigh the evidence and testimony, *to resolve the conflicts in the evidence and testimony*, and determine whether [the claimant] with his RFC can return to his past relevant work, and we will not substitute our judgment for the ALJ's." (emphasis added)); *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983)

(holding the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ) (citations omitted); *Washington v. Comm'r Soc. Sec.*, 906 F.3d 1353 (11th Cir. 2018) ("By failing to identify and resolve the conflict [between the testimony of the vocational expert and the Dictionary of Occupational Titles], the ALJ breached his duty to fully develop the record and offer a reasonable resolution of [plaintiff's] claim."); *Rodriguez v. Kijakazi*, No. 21-21098-CIV-LENARD/LOUIS, 2022 WL 3371570, at *7 (S.D. Fla. July 22, 2022) (collecting cases where the ALJ did not obtain sufficient evidence to determine the demands of claimant's past relevant work, prompting remand), *Report and Recommendation Adopted by Rodriguez v. Kijakazi*, No. 21-21098-CIV-LENARD/LOUIS, 2022 WL 3370788, at *7 (S.D. Fla. Aug. 16, 2022).

Where an ALJ fails to resolve a conflict between a claimant's current medication regimen and the drug-testing requirements of the claimant's past relevant work, the court must remand the case for further review. *See Berry v. Astrue*, 622 F.3d 1228, 1231 (9th Cir. 2010) ("If a drug prescription disqualifies a claimant from performing his past relevant work, he is not capable of returning to that work. Therefore, the ALJ erred by precluding Berry from making a record whether his medically required need to take prescription drugs would bar him from working as a courier."); *id.* at 1232 ("If it is true, as Berry offered to prove, that Berry's prescribed medication regime to treat his potentially disabling condition would categorically prevent him from obtaining work as a courier by rendering him physically unable to pass a drug test that is mandatory across employers, then he cannot meaningfully be said to be capable of working as a courier.

A mandatory requirement that employers cannot hire people with a certain level of pain medication in their blood is in essence a physical demand of the job. The ALJ was not permitted to ignore the possibility that such a mandatory requirement exists, in the face of Berry's offer of proof, merely because no such physical demand appears in the DOT."); *Querec v. Comm'r Soc. Sec.*, No. 6:14-cv-983-Orl-GJK, 2016 WL 70683, at *6 (M.D. Fla. Jan. 6, 2016) ("At step-four, while the VE testified that a hypothetical individual with Claimant's residual functional capacity assessment, age, education, and vocational profile could perform Claimant's past-relevant work as a section chief, the VE also testified that an individual, like Claimant, would be required to pass a drug test and would not be hired if they were prescribed a high-level narcotic. Thus, the VE's testimony establishes a conflict in the evidence at step-four. It is the ALJ's responsibility, not the Court's, to resolve conflicts in the evidence.") (citations omitted); *Scott v. Astrue*, CV 110-052, 2011 WL 2469832, at *8 (S.D. Ga. May 16, 2011) ("The Commissioner disputes the notion that Plaintiff's testimony about the initial loss of his CDL [commercial driver's license] is sufficient to carry his burden of showing he could not perform his past relevant work. However, because Plaintiff was barred from obtaining a CDL as soon as he began taking insulin, the Commissioner 'acknowledges that a real issue as to his ability to perform his past work arose as of that time.' … In light of these considerations, the Commissioner asks the Court affirm the ALJ's conclusion that Plaintiff was not disabled solely on the basis of her step five determination that Plaintiff was capable of other work in the national economy.")

(citations omitted), *report and recommendation adopted by Scott v. Astrue*, CV 110-052, 2011 WL 2461931 (S.D. Ga. June 17, 2011); *see also Riera v. Berryhill*, 17-8694, 2018 WL 5274028, at *9 (E.D. La. Aug. 9, 2018) ("As this case was decided at the fifth step of the § 404.1520 analysis, whether Plaintiff was unable to return to her past job as a nurse while taking prescribed pain medication is not relevant.").

According to a Work History Report dated June 21, 2021, Griffin worked from May of 2014 December of 2020 as a plumber and pipefitter. (Tr. 191). He estimated spending one hour walking; two hours standing; one hour sitting; half an hour climbing; half an hour stooping; half an hour crouching; half an hour crawling; half an hour handling, grabbing, or grasping large objects; half an hour reaching; and half an hour writing, typing, or handling small objects each day. (Tr. 192). He lifted a maximum of 50 pounds and 25 pounds frequently. (*Id.*).

In a Work History Report dated July 17, 2021, Griffin reported working as a plumber and pipefitter from May 1976 to January 2021. (Tr. 202). He described his job responsibilities as follows:

> I was a working foreman. Wrote out daily JSA [Job Safety Analysis], assigned jobs to men and women in my crew for the shift. Ordered material for jobs. Ordered support from other crafts. Made sure piping jobs were put into correct location…. Make all personnel possible [sic] had proper training for their jobs. Make working environment is [sic] clean and safe as possible.

(Tr. 202). In addition, Griffin reportedly engaged in "[t]rouble shootin[g] problems" and "[g]etting torque values for flames." (Tr. 206). He stated his job required flexibility

due to frequently "start[ing] over" in new locations.  (Tr. 207).  Griffin reported walking for four hours; standing for two hours; sitting for two hours; climbing for one hour; stopping for half an hour; and writing, typing, or handling small objects for half an hour.  (*Id.*).  He denied kneeling; crouching; crawling; and handling, grabbing, or grasping big objects.  (*Id.*).  Griffin reported lifting a maximum of 20 pounds and 10 pounds frequently.  (*Id.*).  He recalled occasionally carrying tools "a very short distance" to crewmembers (tr. 204) but noted "99% of the time everything was loaded onto my golf cart and I drove right to [the] work location."  (Tr. 205; *see also* tr. 206 ("There was always some help waiting on me."); tr. 208 ("[I]f lifting or carrying was over my limit I always had help.")).

As discussed previously, the ALJ properly assessed Griffin's RFC by accounting for Griffin's limitations after medical treatment.  However, the ALJ did not properly develop the record or resolve evidentiary conflicts regarding whether Griffin exhibited the RFC to perform his past relevant work.  Specifically, the ALJ based its RFC determination, in part, on a finding that Griffin's pain remained "well[-]managed on medication."  (Tr. 29).  However, the ALJ did not address whether Griffin's medication regimen would disqualify him from his past relevant work as a Plumber Supervisor.  Indeed, Griffin raised this issue in his Adult Function Report (tr. 232) and at the evidentiary hearing before the ALJ (tr. 52-53 ("[T]he point I'm trying to make is that I wasn't on that pain medication then that I'm on now, that shows up in your random drug tests, and then they kick you off the job…. And right now, I don't know what I

would do without the chronic pain medications that I'm on…. [The medication] keeps you off a lot of these jobs.'")).

Thus, a conflict exists in the record, and the court must remand the case so the ALJ may fully develop the record as to Griffin's current medication regimen and the alleged mandatory drug-testing requirements of his previous positions.

Defendant argues the ALJ properly discredited Griffin's testimony because it "was speculative, indefinite, and not authoritative." (Doc. 21 at 2). To this end, Defendant cites *Moore v. Barnhart* for the proposition that "extrapolation and conjecture by the claimant remain insufficient to disturb the ALJ's finding, where it is supported by substantial evidence." *Id.*; 405 F.3d 1208, 1213 (11th Cir. 2005).

As an initial matter, Defendant's reliance on *Moore v. Barnhart* stands misguided. In that case, the claimant argued his physicians "would most likely disagree with the ALJ's findings" regarding his RFC. *Moore*, 405 F.3d at 1213. While *Moore* concerned a claimant's speculations about an external source's medical opinion, the present case concerns Griffin's statements about the physical demands of his own past relevant work and his understanding regarding mandatory narcotics testing vis-à-vis such work. As SSR 82-62 instructs, the claimant himself constitutes the principal source of information for an ALJ's PRW determination. *See* SSR 82-62, 1982 WL 31386, at *3 (Jan. 1, 1982) ("The claimant is the primary source for vocational documentation, and *statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work*.") (emphasis added); *see also Bruet v. Barnhart*, 313 F.

55

Supp. 2d 1338, 1346–47 (M.D. Fla. 2004) (holding the ALJ erred, in conflict with SSR 82-62, by considering the work demands of the claimant's job as generally performed and not as the plaintiff described it).[2]

Moreover, Defendant contends the DOT entry for a Plumber Supervisor does not contain a random drug testing requirement. (Doc. 21 at 4). However, the DOT does not present conclusive evidence of the requirements of a claimant's past relevant work. *See Berry*, 622 F.3d at 1232 ("The ALJ was not permitted to ignore the possibility that such a mandatory requirement exists, in the face of Berry's offer of proof, merely because no such physical demand appears in the DOT."); *see also Barker v. Shalala*, 40

---

[2] In the same vein, Defendant contends Griffin does not possess the same qualifications or expertise as a vocational expert. (See doc. 21 at 3 ("Plaintiff is not a vocational expert (VE), and unlike the VE in this case, Plaintiff has not presumably had the occasion to provide job placement services for individual[s] with physical and mental disabilities[,] … [conduct] local job market assessments, consult[ ] with business owners and potential employer[s], or provide[ ] vocational rehabilitation services."). However, as previously stated, SSR 82-62 instructs the ALJ to give primary importance to the claimant's own testimony via-à-vis the demands of past relevant work. Accordingly, an ALJ need not conclusively rely on vocational expert testimony to determine the demands of past relevant work or the claimant's ability to perform such work. *See Hernandez v. Comm'r of Soc. Sec.*, 433 F. App'x 821, 823 (11th Cir. 2011) ("Generally, vocational expert testimony is not necessary to determine whether a claimant can perform his past relevant work.") (citing *Lucas v. Sullivan*, 918 F.2d 1567, 1573 n.2 (11th Cir. 1990)); *Coley v. Comm'r of Soc. Sec.*, 771 F. App'x 913, 918 (11th Cir. 2019) ("The testimony of a vocational expert is only required to determine whether the claimant's RFC permits her to do other work after she has met her initial burden of showing that she cannot do past work."); 20 C.F.R. § 404.1560(b)(2) ("We will ask you for information about work you have done in the past. We may also ask other people who know about your work. … We may use the services of vocational experts or vocational specialists, or other resources, such as the 'Dictionary of Occupational Titles' and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity."). And although the claimant bears the burden of showing he cannot perform his past relevant work, the ALJ stands duty-bound to resolve conflicts in the evidence between VE testimony and claimant testimony. *Battle v. Astrue*, 243 Fed. App'x 514, 523 (11th Cir. 2007) ("When deciding the case, it is the ALJ's duty … to resolve the conflicts in the evidence and testimony[.]"). Here, the ALJ did not do so.

F.3d 789, 795 (6th Cir. 1994) ("The Social Security regulations themselves provide that the Dictionary of Occupational Titles is not the sole source of admissible information concerning jobs."); *id.* ("'[T]he dictionary says, '[a]n occupation found to have certain characteristics in job situations observed by the employment service does not necessarily preclude the same occupation from having different characteristics in other job situations.' It would be manifestly inappropriate to make the Dictionary of Occupational Titles the sole source of evidence concerning gainful employment.").

Finally, the Commissioner claims mandatory drug testing does not constitute a physical demand of the job, only a requirement relating to an individual's ability to get hired or maintain employment. (Doc. 21 at 5). To this end, the Commissioner cites 42 U.S.C. §1382c(a)(3)(B), 20 C.F.R. § 404.1560(b)(1), and 20 C.F.R. § 404.1566(c) for the proposition that such matters "are discretionary to employers and relate to an employer's hiring practices and preferences." (*Id.* at 5-7). The Commissioner errs in this regard.

Principally,

[a] mandatory drug testing requirement … *is not a mere hiring practice* that is irrelevant to the determination of disability. Under 42 U.S.C. § 423(d)(2)(A), an individual is disabled "only if his physical or mental impairment [is] of such severity that he is ... unable to do his previous work [or] engage in any other kind of substantial gainful work ... regardless of ... whether he would be hired if he applied for work." The language excluding consideration of whether a claimant who sought work would in fact be hired cannot be construed to include a hiring practice that is directly tied to the claimant's disability. Otherwise, the limiting language would defeat the entire statutory scheme, which provides benefits for individuals who cannot work due to a disability.

*Berry*, 622 F.3d at 1232.  Relatedly, "the level of pain medication in [a claimant's] system as a result of his prescribed treatment regime is a direct physical consequence of his impairment, its related symptoms and his physician-prescribed treatment."  *Id.* at 1233 (citing 20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 404.1529(c)(3)).  Finally, mandatory drug screening "appears on its face directly related to a job applicant's ability safely to meet the physical and mental demands of the job."  *Id.*

In sum, the ALJ erred by failing to consider Griffin's alleged inability to meet the mandatory drug screening protocols of his past relevant work.  As such, the court **REVERSES** and **REMANDS** the case for further examination of this particular issue.

## CONCLUSION

For the foregoing reasons, the court **REVERSES** the Commissioner's decision and **REMANDS** the case for further consideration.

**DONE** this 21ˢᵗ day of March, 2025.

HERMAN    N.    JOHNSON,    JR.
UNITED STATES MAGISTRATE JUDGE

58